UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| ANDREW BARATI,<br>  *Plaintiff*,<br><br>  *v.*<br><br>METRO–NORTH RAILROAD<br>COMMUTER RAILROAD COMPANY,<br>  *Defendant*. | Civil No. 3:10cv1756 (JBA)<br><br><br>March 22, 2013 |

**RULING ON DEFENDANT'S MOTION TO AMEND JUDGMENT,
FOR A NEW TRIAL, AND FOR JUDGMENT AS A MATTER OF LAW**

Following a six–day trial, the jury returned a verdict in Plaintiff Andrew Barati's favor on his claims under the Federal Rail Safety Act, 49 U.S.C. § 20109 ("FRSA"), and the Federal Employer Liability Act, 45 U.S.C. § 51 ("FELA"). Defendant Metro–North moves [Doc. # 137] pursuant to Federal Rules of Civil Procedure 59(e) and 60(b) to amend the judgment, for a new trial, and for judgment as a matter of law. For the reasons that follow, the portion of Defendant's motion seeking to alter the judgment will be granted and the remainder denied.

**I.   Factual Background**

In April 2008, while Andrew Barati was working as a trackman with Metro–North, he "tripped the jack" as Defendant taught him and thereby lowered the load of his jack all at once onto his left foot, crushing his left big toe. He reported this injury to Defendant and was subsequently disciplined and terminated. He sought recovery for his injury under the FELA and under the FRSA for the discipline Defendant imposed, where Defendant's decision to discharge him in violation of the FRSA was related to his protected activity of reporting his work–related injury.

On his FELA claim, the jury found that Plaintiff had proved that Metro–North was negligent, that such negligence played a part in bringing about his injuries and that Metro–North had proved that Plaintiff's own negligence contributed to 60% of his injuries. (*See* Verdict Form [Doc. # 123] at 1–2.) The jury awarded him $50,000 in damages, which the Court reduced by 60% to $20,000.

On his FRSA claim, the jury found that Mr. Barati had proved that Metro–North's adverse action against him was due in part to his reporting this work–related injury, and awarded him $40,000 in emotional distress damages, $350 in economic damages for lost personal property, and $1,428 in lost wages, for a total of $41,778 in compensatory damages. (*Id.* at 3.) The jury further awarded $1,000,000 against Metro–North in punitive damages. (*Id.*)

## II.    Motion to Amend the Judgment Pursuant to Rule 59(e) and 60(b)

Defendant moves under Rule 59(e) and 60(b), asking the Court to alter the judgment to reflect the statutory cap on punitive damages provided under the FRSA. Defendant also argues that the punitive damages award must be further reduced to comport with due process.

### A.  Statutory Damages Cap

Under the FRSA, "[r]elief . . . may include punitive damages in an amount not to exceed $250,000." 49 U.S.C. § 20109(e)(3). Accordingly, Defendant's motion to alter the judgment to reflect a punitive damages award of $250,000 is granted on consent.

### B.  Due Process

Defendant argues that under the factors set out in *BMW of North America v. Gore*, 517 U.S. 559, 574 (1996), even Plaintiff's reduced punitive damages award is "excessively high." The cases Defendant relies on, however, involved no statutory cap on punitive

2

damages, *see, e.g.*, State Farm Mut. Auto Ins. Co. v. Campbell, 538 U.S. 408, 425 (2003), and thus are not instructive as to how a legislative determination of a permissible punitive damages maximum affects the analysis of excessiveness.

Three "guideposts" are set down in *Gore*: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases." *Gore*, 517 U.S. at 575; *Thomas v. iStar Fin., Inc.*, 652 F.3d 141, 148 (2d Cir. 2011).

The "degree of reprehensibility" factor is "perhaps the most important indicium of the reasonableness of a punitive damages award." *Gore*, 517 U.S. at 575. Here, by their award of four times the statutory maximum,[1] the jury registered their measure of reprehensibility to underscore their finding that Defendant's conduct was in reckless disregard of Mr. Barati's safety and FRSA rights. Their conclusion was supported by the evidence that Defendant failed to train Plaintiff properly, Defendant failed to provide adequate lighting, resulting in his injury which he promptly reported, and then singled Plaintiff out for discipline for a safety violation. They jury also had evidence that

---

[1] At the charge conference, the parties indicated their preference that the jury not be instructed as to the existence of the statutory cap to damages. This is not an uncommon practice. *See, e.g.*, Luciano v. Olsten Corp., 110 F.3d 210, 221 (2d Cir. 1997) (in a Title VII action, "§ 1981a envisions that the level of punitive damages to be awarded will initially be set by the jury, and that the jury will make that determination without being influenced by the statutory caps."); *Parrish*, 280 F. Supp. 2d at 155 ("[t]he statutory cap is properly excluded from jury instructions, and only after a verdict is submitted, the trial court must ensure that any award complies with the relevant statutory maximums applicable.").

Defendant's termination of Plaintiff[2] was contrary to its written policies and FRA regulations, was a self-serving effort to discourage employee injury reporting in order to keep its injury and lost-workday statistics low, violated Defendant's own obligation to accurately report employees' on-the-job injuries and resulting lost work days, and contravened Defendant's "safety statement" that "[w]e are committed to the safety of our employees and our customers," and "[w]e are determined to provide a work environment where all employees work safely." (Kirsch Testimony, Tr. Mar. 16, 2012 [Doc. # 149] at 24:10–19.) The jury, considering all the trial evidence, was entitled to conclude that Metro-North's actions against an employee who reported an on-the-job injury which he sustained as a result of Defendant's outdated training and the poor lighting provided in his work area, was very reprehensible. (*See* Section III *infra*; *see also* trial testimony of Anne Kirsch, George Gavalla, John Wagner, and Mark Ward.)

As to the "disparity" between compensatory damages and punitive damages awarded, Defendant excludes the $40,000 in emotional distress damages, which it claims cannot be recovered under the FRSA, *see infra* at 11, and argues that the resulting ratio between the amount of punitive damages ($250,000) and the remaining compensatory damages awarded ($1,778) is a constitutionally improper "ratio of nearly 141 to 1." (Def.'s Mem. Supp. [Doc. # 138] at 10.) In *Gore*, the Supreme Court noted that while it has "consistently rejected the notion that the constitutional line is marked by a simple mathematical formula," 517 U.S. at 582, the ratio between compensatory damages and punitive damages is the "most commonly cited indicium of an unreasonable or excessive punitive damages award," 517 U.S. at 580 ("When the ratio is a breathtaking 500 to 1 . . . the award must surely 'raise a suspicious judicial eyebrow.'") (internal citations omitted).

---

[2] Plaintiff's termination was ultimately converted to a suspension without pay.

Here, the ratio between the punitive award of $250,000 and total compensatory damages of $41,778 is approximately six to one, which should cause no judicial facial expression at all, much less a raised eyebrow. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003) ("Single–digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1.").

*Gore*'s final factor, "sanctions for comparable misconduct," cannot be applied here because Mr. Barati's case is the first FRSA case tried to a jury verdict in the country. Applying the two *Gore* factors to the circumstances of Mr. Barati's FRSA case, the Court concludes that Mr. Barati's reduced punitive damages award does not violate due process, and accordingly, his $250,000 award will not be reduced.

### III.   Motion for a New Trial[3]

Metro–North moves for a new trial on the basis that it was unfairly prejudiced by the testimony of Plaintiff's expert witness George Gavalla.[4] Metro-North asserts that Gavalla's testimony was "highly speculative" and presented "a fairly scathing picture of 'railroad culture'" which was unduly prejudicial to Metro-North. (Def.'s Mem. Supp. at 5.) It also contends that cross–examination did not adequately cure the negative "culture"

---

[3] "[F]or a district court to order a new trial under Rule 59(a), it must conclude that "'the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice,'" i.e., it must view the jury's verdict as "against the weight of the evidence." *Manley v. AmBase Corp.*, 337 F.3d 237, 244–45 (2d Cir. 2003).

[4] Defendant offers no legal authority on which to base its motion for new trial on account of Gavalla's testimony, and the Court interprets Defendant's "unfair prejudice" argument as one referring to Federal Rule of Evidence 403, which provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice."

prejudice to Defendant which Plaintiff's counsel revisited and made the primary theme of his closing argument.

The Court denied Defendant's pre–trial motion in limine to totally preclude Mr. Gavalla's trial testimony but narrowed the scope of Mr. Gavalla's permissible testimony to his experience and knowledge as the head of the Federal Rail Administration ("FRA") Office of Safety for seven years, with responsibility for carrying out the FRA's safety inspection program, safety enforcement program, accident investigation program, and drafting of safety rules, regulations, and standards. (Gavalla Testimony, Tr. Mar. 20, 2012 [Doc. # 150] at 124:6–10.) Mr. Gavalla was not permitted to testify about the specifics of any particular railroad's safety methodologies, only what he, in his capacity as the head of FRA's Office of Safety, identified as the rules and safety regulations that railroads were required to implement, known as the "Internal Control Plan," or "ICP." Mr. Gavalla defined an ICP as:

> a policy statement whereby a railroad states its commitment to the complete and accurate reporting of all accidents, employee injuries, occupational illnesses, and it sets forth its commitment to fully complying with FRA's regulations regarding accident incident reporting, and it also has a policy statement setting forth the railroad's commitment to the prevention of or the prohibition against harassment or intimidation of railroad workers . . . regarding the reporting of accidents and injuries, and it also requires the railroads to sort of specify or set forth the system that they have in place to assure that those two objectives are met.

(*Id.* at 131:13–132:1.) Mr. Gavalla's testimony about Metro-North's own ICP was that it was "exactly identical to the FRA requirement," which requires that the railroad "completely and accurately report all accidents, injuries and occupational illnesses, and that it comply with the requirements of the FRA regulations regarding accidents and

injury reporting." (*Id.* at 135:1–6.) It was the large gap between Defendant's ICP and its actual practice that was the gist of Plaintiff's closing.

Mr. Gavalla did not testify as to "railroad culture" in the manner that Defendant contends. Indeed, Mr. Gavalla's testimony was general, and not focused on any particular railroad's culture, although he also did not exclude Metro–North. On direct examination, Mr. Gavalla testified about the importance of railroads accurately reporting injuries and employees' "lost days from work" from injuries, and testified that the "FRA uses the lost days data as a measure of severity when making determinations of where to send their inspectors, . . . [y]ou need to have accurate data on the severity of the accident and injury." (*Id.* at 143:16–22.) He further opined that "[o]bviously, the whole point and purpose of the internal control plan is to ensure that a railroad has an effective . . . safety management program in place so that you could identify incidents that were not reported properly and then correct them." (*Id.* at 144:3–8.)

When asked, "in the context of all of the injuries reported to the FRA by all of the railroads during the year, what difference does it make to swear to the accuracy of an injury report that underreports lost injury days by one–third?" Mr. Gavalla responded:

> Well, again, it goes to the—you'd have to look at the implications for why was that discrepancy allowed to occur. You'd have to ask the question, well, did the railroad—was the railroad deficient in their management of the safety process? Did it fail to actually find that data out and get it to the right people responsible in reporting it? So, did the people who were responsible for escalating that information—or giving that information to the reporting officer, did they not know what they were supposed to do, or did the system they have in place not catch them. And if the answer is, well, those things were okay, then you'd have to ask the question, well, was there something—*was there a problem with the railroad's safety culture, the integrity of it, its intentions to report*. So, you'd have to look at why wasn't that accident or injury reported properly.

(*Id.* at 144:14–145:6 (emphasis added).) On cross-examination, defense counsel clarified with Mr. Gavalla that when he had testified about the "culture of a railroad," he was not speaking specifically about Metro–North, and Mr. Gavalla agreed, explaining that during his direct examination, "I was being asked to opine on the principles involved and the rule and the regulations involved as opposed to the specifics of the issue." (*Id.* at 178:18–21.)

Mr. Gavalla also testified generally about "categories of conduct" which the FRA identified as falling within a particular ICP regulation with respect to the "harassment or intimidation of persons calculated to discourage or prevent the reporting of injuries." (*Id.* at 147:19-22.) The categories he identified included: "singling out employees who are injured for disciplinary action," disciplining employees who are injured on the job because of safety violations, while other employees, who commit the same safety violations and are not injured are not disciplined, and having management or railroad officials "threaten or recommend to employees that they're better off not reporting an injury or an accident." (*Id.* at 148:1–16.) Mr. Gavalla spoke of these "categories of conduct" in a general manner, without providing any opinion as to whether Metro–North had or had not engaged in any such conduct. That testimony came from Defendant's own employees which focused specifically on Metro–North's safety regulations, policies, and "culture." Metro–North's Chief Safety and Security Officer, Anne Kirsch, was asked about Metro–North's ICP, which required FRA approval, and about Metro–North's safety rules and training materials, which are not required to be sent to the FRA. Ms. Kirsch testified that the safety manual required that "when lowering the jack, lower it one notch at a time. Do not release the load all at once" (Kirsch Testimony, Tr. Mar. 16, 2012 [Doc. # 149] at 33:9–10; Safety Rules [Ex. 10] at 1300.8). She

8

identified this particular safety rule as "guidance . . . provided to employees to . . . prevent injuries when performing tasks" (Tr. at 149:14–18). However, Ms. Kirsch conceded that Metro–North had instead trained Plaintiff to lower a jack by "tripping it" and letting the load drop all at once (*id.* at 37:6–12), which is how Plaintiff injured himself. Ms. Kirsch also conceded that when Metro–North initially submitted its injury report about Mr. Barati's injury, it underreported the number of "lost work days" by over 20 days. (*Id.* at 73–74.)

Given the testimony from Ms. Kirsch about Metro–North's own safety rules, reporting policies, and disciplinary practices, juxtaposed with the general testimony provided by Mr. Gavalla about the FRA's role in investigating railroad workplace safety, and the importance of accurately reporting work–related injuries, it is clear that Mr. Gavalla's testimony was proper and not unfairly prejudicial to Metro-North. It was Ms. Kirsch's testimony, combined with testimony by Track Department Director John Wagner and Training Department Manager Mark Ward that revealed the discrepancies between Defendant's articulated policies and its actual training practices and Defendant's disparate disciplinary treatment of just Plaintiff that entitled the jury to find Defendant liable under the FELA and FRSA.

Defendant generally objects to Attorney Goetsch's rebuttal summation for the first time in post–trial briefing, but does not point to any specifics from the summation that it now challenges. A court considers claims of improper summation argument "in the context of the trial as a whole, examining, among other things, the '[t]otality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to the real issues before the jury, [and] the manner in which the parties and the

court treated the comments.'" *Okraynets v. Metro. Transp. Auth.*, 555 F. Supp. 2d 420, 429 (S.D.N.Y. 2008) (internal citations omitted).

Attorney Goetsch's remarks about a "safety culture" particular to Metro–North in his rebuttal responded directly to Attorney Fineman's closing arguments that Metro–North did not have a "culture." The context Attorney Goetsch set for his rebuttal included the pieces of evidence of improper training and poor lighting from which the jury could infer a violation of the FELA, and Defendant's underreporting of Plaintiff's lost workdays and its disciplining only Plaintiff when he reported his injury as supporting a finding of a FRSA violation. He did not mischaracterize facts or testimony from Metro–North's witnesses, and his description of this "safety culture," which he argued evinced a reckless disregard for its employees, was argument that fell well within the bounds of propriety. No contemporaneous objection was taken to Attorney Goetsch's comments about "safety culture," and the jury had six days of trial evidence with which to evaluate Attorney Goetsch's arguments. *See Marcic*, 397 F.3d at 127–28 ("To the extent that Reinauer's counsel's statements were improper, they were not objected to, and occurred in the context of a summation spanning thirty-seven pages of trial transcript, at the end of a week–long trial in which voluminous evidence was introduced that sufficed to support the jury's verdict.").

In short, absent a showing of undue prejudice from Mr. Gavalla's testimony or Attorney Goetsch's rebuttal summation focusing on Metro–North's "culture," there was no "manifest error" or a "miscarriage of justice" warranting a new trial.

**IV.    Motion for Judgment as a Matter of Law as to Emotional Distress Damages**[5]

At trial, the Court charged the jury that FRSA remedies included compensatory damages, including emotional distress damages, and denied Metro–North's motion in limine to preclude Mr. Barati from offering any evidence or argument regarding the emotional distress he claimed to have suffered in connection with his FRSA claim. Defendant frames this issue again in its motion for judgment as a matter of law, arguing that the FRSA does not permit an award of emotional distress damages, and that the jury should not have been permitted to consider or award such damages. For the reasons that follow, the Court concludes that damages for emotional distress are available under the FRSA, and Metro North's motion is therefore denied.

Under the FRSA's remedies section, "[a]n employee prevailing in any action . . . shall be entitled to all relief necessary to make the employee whole." 49 U.S.C. § 20109(e)(1). The damages section of the FRSA states in pertinent part:

> (2) Damages.—Relief in an action under subsection (d) (including an action described in subsection (d)(3)) shall include—

---

[5] Judgment as a matter of law may be rendered if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. Proc. 50(a)(1). A renewed Rule 50(b) motion will be granted "only if the evidence, drawing all inferences in favor of the non–moving party and giving deference to all credibility determinations of the jury, is insufficient to permit a reasonable juror to find in his favor." *Lavin–McEleney v. Marist College*, 239 F.3d 467, 479 (2d Cir. 2001). Thus, "judgment as a matter of law should not be granted unless (1) there is such a complete absence of evidence supporting the verdict that the jury findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Id.* at 480 (quoting *DiSanto v. McGraw–Hill, Inc.*, 220 F.3d 61, 64 (2d Cir. 2000)). A movant under Rule 50 "faces a high bar." *Id.*

> (A) reinstatement with the same seniority status that the employee would have had, but for the discrimination;
> (B) any backpay, with interest; and
> (C) compensatory damages, including compensation for any special damages sustained as a result of the discrimination, including litigation costs, expert witness fees, and reasonable attorney fees.

*Id.* § 20109(e)(2).

The issue of whether compensatory damages for emotional distress are recoverable under the FRSA appears to be one of first impression. Thus, Plaintiff and Defendant urge the Court to consider two other federal statutes for guidance. Plaintiff cites the remedies provision of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR–21"), as support for his argument that emotional distress damages are contemplated as part of the "compensatory damages" allowed under the FRSA and AIR–21. The AIR–21 Remedy section provides:

> (B) Remedy. —If, in response to a complaint filed under paragraph (1), the Secretary of Labor determines that a violation of subsection (a) has occurred, the Secretary of Labor shall order the person who committed such violation to—
>> (i) take affirmative action to abate the violation;
>> (ii) reinstate the complainant to his or her former position together with the compensation (including back pay) and restore the terms, conditions, and privileges associated with his or her employment; and
>> (iii) provide compensatory damages to the complainant.

49 U.S.C. § 42121. Defendant relies on the language of the damages provision of the Sarbanes–Oxley Act ("SOX") to support its conclusion that compensatory damages under the FRSA do not include damages for emotional distress. Under SOX, the section entitled "Remedies" provides:

> (c) Remedies.—

> (1) In general.—An employee prevailing in any action under subsection (b)(1) shall be entitled to all relief necessary to make the employee whole.
> (2) Compensatory damages.—Relief for any action under paragraph (1) shall include—
>> (A) reinstatement with the same seniority status that the employee would have had, but for the discrimination;
>> (B) the amount of back pay, with interest; and
>> (C) compensation for any special damages sustained as a result of the discrimination, including litigation costs, expert witness fees, and reasonable attorney fees.

18 U.S.C. § 1514A.

"As in all statutory construction cases, we begin with the language of the statute." *Barnhart v. Sigmon Coal Co., Inc.*, 534 U.S. 438, 450 (2002). However, the language of the FRSA permitting "compensatory damages" is without further detail as to the intended scope of this term beyond inclusion of "special damages." AIR–21 similarly permits recovery for "compensatory damages" without detail or delimintation. SOX, on the other hand, while providing a make–whole remedy, limits "compensatory damages" to reinstatement, back pay and special damages. A treatise definition of 'compensatory damages' is "the damages awarded to a person as compensation, indemnity, or restitution for harm sustained by him [or her]," Restatement (Second) of Torts § 903 (1979). "Compensatory damages" are divided into those that are 'pecuniary,' and 'non–pecuniary.' *Id.* § 905. 'Non–pecuniary' compensatory damages include "compensation for bodily harm and emotional distress, and are awarded without proof of pecuniary loss." *Id.* § 905–06. 'Special damages' are defined as "compensatory damages for a harm other than one for which general damages are given." *Id.* § 904.

Since both FRSA and AIR–21 have comparable "compensatory damages" provisions, and AIR–21 has served as a statutory model for the FRSA, which expressly incorporates the burden of proof of AIR–21, *see* 49 U.S.C. § 20109(d)(2)(i) ("Burdens of

13

proof.—Any action brought under (d)(1) *shall be governed by the legal burdens of proof set forth in section 42121(b)* [AIR–21].") (emphasis added); *see also Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152 (3d Cir. 2013) ("[t]he FRSA incorporates by reference the rules and procedures applicable to Wendell H. ford Aviation Investment and Reform Act for the 21st Century ("AIR-21") whistleblower cases."),[6] the construction of AIR–21 provides a better analog than SOX, particularly because they carry analogous safety whistleblower protections for employees in the airline and railroad industries. The few AIR–21 cases addressing emotional distress damages permit their recovery. *See, e.g.*, *Vieques Air Link, Inc. v. U.S. Dep't of Labor*, 437 F.3d 102, 110 (1st Cir. 2006);[7] *Luder v. Continental Airlines, Inc.*, ARB Case No. 10-026 & ALJ Case No. 2008-AIR-2009 (January

---

[6] *Araujo v. New Jersey Transit Rail Operators, Inc.* is the first appellate decision to address the FRSA, and while the decision, which reversed a grant of summary judgment by the district court, does not address the damages inquiry, the Third Circuit explicitly noted looked to AIR–21 for the requirements for the FRSA plaintiff's prima facie case.

[7] In *Vieques Air Link*, the First Circuit affirmed an Administrative Law Judge's award of $50,000 in compensatory damages for "mental anguish," writing:
> [T]he ALJ relied on Negrón's testimony that he struggled to support his wife and two infant children while he looked for new full–time employment following his termination by VAL. Although Negrón found a new job by mid-September, 2002, in the meantime he was forced to sell both of his family's modest cars and deplete their meager savings to make ends meet. Negrón specifically testified that this ordeal caused him suffering and pain. The ALJ noted that like circumstances had justified similar awards in a number of cases which had come before the ARB; for its part, the ARB agreed with this assessment. Accordingly, we believe that substantial evidence supported the $50,000 award that Negrón received for the mental anguish caused by his termination.

*Vieques*, 437 F.3d at 110.

31, 2012).[8] Significantly, there are no reported cases concluding that emotional distress damages are unavailable under AIR–21.

Adhering to the rule of statutory construction, "the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain . . . the sole function of the courts is to enforce it according to its terms," *Caminetti v. United States*, 242 U.S. 470, 485 (1917). In the absence of any indication from the statutory language of an intention to limit "compensatory damages" to less than its generally accepted definition, the Court concludes that the FRSA permits recovery for emotional distress. This conclusion that no limitation was intended on the scope of damages recoverable is buttressed by the language that special damages are also included: "compensatory damages, including compensation for any special damages . . ." Defendant's view that this statutory language should be read as limiting compensatory damages to the itemized special damages is contrary to its plain meaning. *See West v. Gibson*, 527 U.S. 212, 217 (1999) ("the preceding word 'including' makes clear that the authorization is not limited to the specified remedies there mentioned."). Accordingly, Defendant's motion for judgment as a matter of law pursuant to Rule 50(b) is denied, and Plaintiff's emotional distress damages in the amount $40,000 will stand.

---

[8] In *Luder*, the Administrative Review Board "affirmed compensatory damage awards for emotional distress, even absent medical evidence, where the lay witness statements are credible and unrefuted." ARB Case No. 10-026 & ALJ Case No. 2008-AIR-2009.

## V.     Conclusion

For the reasons discussed above, Defendant's motion to amend the judgment is GRANTED and Defendant's motion for a new trial is DENIED. Defendant's motion for judgment as a matter of law with respect to emotional distress damages is also DENIED.

The Clerk is directed to amend the judgment to reduce the punitive damages award to the statutory cap of $250,000.

IT IS SO ORDERED.

_____/s/_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 22nd day of March, 2013.